## COPELAND'S EX'R *vs.* COPELAND'S HEIRS.

[BILL IN EQUITY TO SET ASIDE PROBATE OF WILL.]

1. *Burden of proof as to mental capacity of testator.*—When the validity of a will is contested in chancery, after it has been admitted to probate, on the ground of the testator's mental incapacity and unsoundness, the burden of proof is on the contesting party.
2. *Evidence of insanity.*—The evidence in this case, relative to the testator's mental condition, critically discussed by the chancellor, and held sufficient to establish unsoundness of mind.

APPEAL from the Chancery Court of Limestone.
Heard before the Hon. JOHN FOSTER.

THIS bill was filed by the heirs-at-law and distributees of Ira A. Copeland, deceased, against his executor and legatees, and sought to set aside the probate of his will on the grounds of mental incapacity, fraud, and undue influence. The evidence is stated at sufficient length in the opinion of the chancellor, which is adopted as the opinion of this court, and which was as follows:

FOSTER, Ch.—"I have given this case a careful examination, aided by the able and elaborate arguments of the counsel on both sides; and yet I cannot regard it as free from doubt and difficulty. Although the real issue presented for decision is, whether the will of Ira Copeland is valid or not, and consequently the respondents hold the affirmative; yet, as the complainants attempt to impeach the will on the ground of the insanity or incapacity of the testator, and as the law presumes every man to be sane until the contrary is shown, the burden of proving un-

soundness or incapacity is thrown on the party contesting the will for that cause.

"The testimony on this point, at least so far as the opinion of witnesses is concerned, is very conflicting. Two of the subscribing witnesses, Nich. Davis, Jr., and Thos. H. Hobbs, express the opinion, that the testator was of sound and disposing mind and memory at the time of executing the will; and the reasons assigned by them for this opinion are entitled to great weight. There is nothing on the face of the will, or in the disposition of the property by the testator, from which the court could infer unsoundness of mind. The bequests to the 'missionary cause' and to the Methodist church are not unreasonably large, or disproportionate to the testator's means; and a good and sensible reason was assigned for the legacy to Mrs. Collier. These are circumstances strongly conducing to show that the testator had sufficient capacity and soundness of mind to make a valid will. But, on the other hand, the two other subscribing witnesses, Mr. Ford and Mr. Tyus, (the latter being not only a subscribing witness, but the writer of the will,) are equally positive in the opinion, that said Copeland had not sufficient mental capacity to make a will; and their reasons for this opinion are at least equally conclusive. Tyus states, that while writing the will, a short time before its execution, from the dictation of the testator, his directions 'were not clear and explicit, such as a man of sound and clear mind would give;' that he, the testator, 'manifested a confused recollection of persons and things;' and that, 'although witness cannot say positively that he gave contradictory directions, yet he would repeat some things which he had already mentioned a few moments before.' Ford states, that the testator 'had a confused recollection of his property;' that he gave a legacy to a person in the country which was not incorporated in the will, and did not notice the omission; and that suggestions were made to him by the by-standers while Mr. Tyus was writing the will.

"There is one circumstance which entitles the opinion of Ford and Tyus to more weight than the opinion of

Hobbs and Davis—that is, that the former were previously intimately acquainted with the testator, and, therefore, had the opportunity of comparing his mental condition at the time of the execution of the will with his mental capacity and operations when sound and free from disease; while Hobbs and Davis had no previous acquaintance with him, and saw him for the first time when called on to witness his will. This circumstance, I think, is entitled to great weight. The first witnesses had great advantage over the latter, in forming a correct opinion as to the sanity or insanity of Copeland, from their previous acquaintance with him: they had the means of comparison, which the others lacked.

"We should naturally suppose, that the testimony of the attending physicians would throw much light on the question at issue. The will was executed between 9 and 10 o'clock at night, probably near the latter hour. His physicians left him about 8½ o'clock. They both testify that, in their opinion, he then had sufficient capacity to make the will. But Dr. Malone, who says he carefully watched his mental condition, states, that 'his mind was clear until near 8 o'clock, P. M.,' when he '*first saw symptoms of decided aberration of mind;*' that '*it was wandering and unsteady on some subjects, and clear on others.*' It must be here borne in mind, that the physician speaks of *aberration*—disorder—not mere weakness of mind, which must have been the necessary consequence of the testator's extremely prostrate physical condition. The other physician, Dr. Powell, who called at a later hour, between 11 and 12 o'clock, found his patient 'wildly delirious.'

"Thomas G. Tyus, whose acquaintance and intimacy with the testator would probably entitle him to express an opinion, and who saw him during the day, says, that his deportment was '*unnatural;*' that he was 'disposed to make considerable noise by singing;' that 'he would stop for a few moments, and then begin again;' that he was no better at night than during the day; and that he does not think he was capable of doing ordinary business, or of making a will.

"The testimony shows, that the testator, at the time of making the will, had been for several days prostrate with a severe and painful disease, which was making rapid progress towards a fatal termination. He was then, in the language of Dr. Malone, 'sinking fast,' almost *in articulo mortis.* His mind necessarily partook of the enfeebled and weakened condition of his body. Before the will was written, his mind had become wandering and unsteady: there was not only weakness, but aberration of the intellectual faculties. This condition, doubtless, was aggravated by the opium he had been taking during the day, and also by the consciousness, which now for the first time broke in upon his mind, that death was inevitable and just at hand. His recollection of persons and things was confused. The directions respecting his property were not clear or explicit. These circumstances, coupled with the pregnant fact that he was wildly delirious in an hour or two, lead me to pronounce against the will."

The chancellor therefore rendered a decree for the complainants, setting aside the probate of the will; and his decree is now assigned as error.

JAS. E. BELSER, and LUKE PRYOR, for appellants.

ROBINSON & JONES, *contra.*

RICE, C. J.—Upon an examination of the evidence in this cause, we feel bound to say, that the decree of the chancellor is correct. We adopt his opinion as the opinion of this court, and affirm his decree, at the costs of the appellants.